# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | |
|---|---|
| **WHITNEY BANK,** | * **CIVIL ACTION NO. 6:16-cv-01427** |
| *Plaintiff* | * |
| | * |
| **VERSUS** | * **JUDGE REBECCA F. DOHERTY** |
| | * |
| **SMI COMPANIES GLOBAL, INC., and** | * |
| **VAUGHN S. LANE** | * **MAG. JUDGE PATRICK J. HANNA** |
| *Defendants* | * |

**************************************************************************

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM ON BEHALF OF SMI COMPANIES GLOBAL, INC., AND VAUGHN S. LANE

**NOW INTO COURT**, respectfully and through undersigned counsel, come named Defendants SMI Companies Global, Inc., and Vaughn S. Lane ("Defendants"), who deny each and every allegation contained in the Complaint of Plaintiff Whitney Bank ("Whitney Bank"), except as may be hereinafter specifically admitted.

In response to the enumerated paragraphs of Whitney Bank's Complaint, Defendants answer, respond, and aver, as follows:

### 1.

The allegations of paragraph 1 cannot be admitted or denied for lack of sufficient information to justify a reasonable belief therein.

### 2.

The allegations of paragraph 2 as to the status and citizenship of Defendants are admitted.

### 3.

The allegations of paragraph 3 do not require a response of Defendants, however, as alleged, Defendants deny Whitney's Bank's entitlement to the relief sought based upon the defenses, allegations, and counterclaims being asserted by Defendants.

4.

The allegations of paragraph 4 cannot be admitted or denied for lack of sufficient information to justify a reasonable belief therein.

5.

The allegations of paragraph 5 are admitted.

6.

The allegations of paragraph 6 are admitted.

7.

The allegations of paragraph 7 are admitted.

8.

The allegations of paragraph 8 are denied for lack of sufficient information to justify a reasonable belief therein. Defendants admit only that SMI Companies Global, Inc. ("SMI") is a citizen of Louisiana, and that Vaughn S. Lane ("Lane") is a citizen of Louisiana.

9.

The allegations of paragraph 9 are denied as written. Defendants admit only that a lender and borrower relationship exists between Whitney Bank and SMI, and that Lane provided a personal guaranty. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

10.

The allegations of paragraph 10 are denied as written. Defendants admit only that the lender and borrower relationship was established for the benefit of SMI's operations. Defendants admit the location of SMI's business operations is 1456 La. Hwy. 317, Centreville, Louisiana 70522, which is within the territorial limits of the this Court. SMI further admits its capacity to sue and be sued, and that it is subject to the personal jurisdiction of this Court.

11.

The allegations of paragraph 11 are admitted.

12.

The allegations of paragraph 12 are admitted insofar as Whitney Bank is alleged to be a citizen of the State of Mississippi and that subject matter jurisdiction exists. Defendants reserve the right, following discovery related to Whitney Bank's citizenship allegations, to amend this response and contest subject matter jurisdiction in this matter.

13.

The allegations of paragraph 13 are admitted.

14.

The allegations of paragraph 14 are admitted.

15.

The allegations of paragraph 15 are admitted.

16.

The allegations of paragraph 16 are admitted.

17.

The allegations of paragraph 17 are admitted.

18.

The allegations of paragraph 18 are admitted.

19.

The allegations of paragraph 19 are admitted.

20.

The allegations of paragraph 20 are admitted.

21.

The allegations of paragraph 21 are admitted insofar as the existence of documents referenced and the stated terms therein. However, Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

22.

The allegations of paragraph 22 are admitted.

23.

The allegations of paragraph 23 are admitted insofar as the existence of documents referenced and the stated terms therein. However, Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

24.

The allegations of paragraph 24 do not require a response of Defendants.

25.

The allegations of paragraph 25 are denied as written, in particular, the alleged rights of Whitney Bank as holder. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

26.

The allegations of paragraph 26 are denied as written. It is admitted that the subject promissory notes have matured as per their terms. However, Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

27.

The allegations of paragraph 27 are admitted only insofar as it relates to the transmission of a demand letter, the content of which speaks for itself. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

28.

The allegations of paragraph 28 are denied. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

29.

The allegations of paragraph 29 are denied. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

30.

The allegations of paragraph 30 are denied. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

31.

The allegations of paragraph 31, and Whitney Bank's entitlement to such relief are denied. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank,

and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

32.

The allegations of paragraph 32 do not require a response of Defendants. Out of an abundance of caution, Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

Prayer and Subparagraphs I through VII.

The allegations of Whitney Bank's Prayer, including subparagraphs I through VII, and the alleged entitlement to such relief are denied. Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

**<u>AFFIRMATIVE DEFENSES</u>**

I.

Defendants affirmatively deny Whitney Bank's right to collect any indebtedness as pled in the Complaint. Any alleged past or present indebtedness was caused and/or induced by Whitney Bank, and performance by Defendants rendered impossible due to the tortious and inequitable acts, breaches of contract, and other unreasonable and legally proscribed actions of Whitney Bank.

II.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's violation of its legal, contractual, and implied duty of good faith dealing.

III.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's breaches of contract, including but not limited to, failure to act reasonably and equitably in exercising control over SMI's business affairs, handling collateral, and generally enforcing the loan agreements.

IV.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's breach of its fiduciary duty after establishing a special relationship with SMI through the feasibility determination, asserting itself into the daily workings of SMI's business affairs and controlling same.

V.

The alleged default and indebtedness of Defendants were caused by the negligence of Whitney Bank in its dealings with Defendants and Defendants' customers.

VI.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's abuse of rights.

VII.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's negligent misrepresentation, pursuant to La. Civ. C. arts. 2315 and 2316.

VIII.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's tortious interference with the business of SMI, including malicious and wanton conduct in controlling SMI's accounts receivables and payables.

IX.

The alleged default and indebtedness of Defendants were caused by Whitney Bank's intentional interference with contracts and existing working relationships SMI profitably enjoyed with customers.

X.

The alleged default and indebtedness of Defendants were caused Whitney Bank's willful actions, which were proscribed by law, including but not limited to violations of U.C.C. §1-203, La. Civ. C. arts. 2315, 2316, and 2474.

**WHEREFORE**, Defendants SMI Companies Global, Inc., and Vaughn S. Lane pray the foregoing answer and affirmative defenses be deemed good and sufficient, and that after all due proceedings are had, that there be judgment in Defendants favor, dismissing all of Plaintiff's claims, with prejudice, and at its cost.

## <u>COUNTERCLAIM</u>

**AND NOW**, assuming the role of Counterclaimants, come SMI Companies Global, Inc. ("SMI"), and Vaughn S. Lane ("Lane"), and assert the following counterclaim against defendant Whitney Bank.

1.

Made Counterclaim Defendant herein is Whitney Bank ("Whitney Bank" or sometimes the "Bank"), on information and belief, a bank chartered in the State of Mississippi, and a citizen of the State of Mississippi.

## I.  BACKGROUND

2.

SMI is and markets itself as a fully integrated provider of heavy metal manufacturing and turnkey industrial product solutions. SMI particularly markets and services oil, gas and energy businesses. Vaughn S. Lane is the President of SMI.

3.

Prior to 2015 SMI enjoyed a fairly ordinary lender to customer relationship with Whitney Bank, with Whitney Bank loaning money to SMI for business operations, for which Whitney Bank earned valuable interest. This relationship is reasonably represented by the notes and security agreement, and related, referenced in paragraphs 13 through 20 of Whitney Bank's Complaint. Prior to the acts and omissions of Whitney Bank complained of in this Counterclaim, SMI remained current as to that indebtedness and compliant with its contractual obligations. (Doc. 1, Exhibit "E" thereto, Note No. 1)

4.

In late 2015, SMI won a contract from Halliburton for the fabrication of 8 vessels. The vessels were to be fabricated over the course of approximately 10 months with a contract value of approximately $2 million. The Halliburton contract allowed it the option of progress billing or one payment at the conclusion of the job. Once work began on the project, it must be completed for

any interim invoices to become valid and payable. At the outset, Halliburton elected the option of one payment at the conclusion of the job.

5.

Given the term allowing Halliburton a one payment option, SMI approached Whitney Bank to set up a special credit line vehicle that would permit SMI to fund the Halliburton job.

6.

The relationship between SMI and Whitney Bank related to the proposed special credit line took on a dramatically different complexion, from what may described as ordinary or customary, to especially confidential. SMI and Whitney collaborated on the feasibility of the Halliburton job considering such factors as market conditions, SMI's existing business and cash position, the Halliburton contract requirements, and special consideration needed from Whitney Bank since SMI had exceeded Whitney Bank's standard lending parameters.

7.

At the time the feasibility determination was being made between SMI and Whitney Bank, SMI's business was suffering from a lack of available work with little to no other work projects available in the market for bidding. The result was a cash poor position for SMI that necessitated the successful completion of the Halliburton project, and the related flexibility and cooperation that Whitney Bank represented would be forthcoming.

8.

Whitney Bank participated and understood all feasibility considerations involving SMI and agreed to move forward with the special credit line. Ultimately, Whitney Bank designed the mechanics of reporting and loan control, secured Halliburton agreements, agreed to Halliburton's

Master Service Agreement, the contract and related purchase order, and knew SMI was obligated to the terms of same.

9.

The loan was made and the special credit line was set at $900,000, which is represented by the note and related documents referenced in Whitney Bank's Complaint in paragraphs 22 through 23. (Doc. 1, Exhibit "F" thereto, SMI Note No. 2) This special line was a marginally adequate amount to complete the project that factored the completion of other SMI projects and prompt payment by customers. Essentially, the credit line arrangement left no margin for the unexpected and once initiated, the Halliburton job had to be completed for full payment to SMI and satisfaction of the special credit line. Lane executed a personal guaranty for the special line.

10.

As a result of the special relationship developed between the parties Whitney Bank was fully aware of the precarious position SMI was in and that successful completion of the Halliburton job was vital to the survival of SMI. In addition to the prior loan amount (SMI Note No. 1) and the new special credit line (SMI Note No. 2), SMI also held a Whitney Bank issued credit card (Acct. No. XXXX XXXX XXXX 1474). The balance of the credit card is approximately $8,900. Each item of extended credit and alleged indebtedness is made a part of this Counterclaim.

11.

SMI, at all times pertinent, participated, worked, and negotiated in good faith with Whitney Bank. The special relationship between SMI and Whitney Bank led SMI to reasonably believe that Whitney Bank would act with the understanding of SMI's contractual obligations to Halliburton, to know and be sensitive to the operating environment, to conduct business and protect its collateral

in good faith. Moreover, Whitney Bank was fully aware that once the Halliburton project was underway that SMI had no other options to finance the work.

12.

The parties moved forward with the mutual understanding that the successful completion of the Halliburton contract was vital to a successful outcome for both SMI and Whitney Bank.

13.

Within a few months of initiating the Halliburton project work, multiple projects of SMI, including Halliburton, experienced delays and the market for SMI's work continued to tighten. With no margin for error or upsets created by the thin special credit line ceiling, SMI's position became tenuous. Both SMI and Whitney Bank, at least initially, worked together to navigate the changing conditions with the objective to finish the Halliburton job.

14.

Over time, however, Whitney Bank's response and actions revealed a different motivation and consideration, which did not include maintaining the viability of SMI as an ongoing concern. Instead, Whitney Bank used its superior position of control to the detriment of SMI's business. This included acts and omissions rendering performance of SMI's obligations on all extensions of credit (original loan, special line of credit, and credit card) impossible.

15.

Whitney Bank's role as a fiduciary of SMI is demonstrated by the full control it had over SMI's accounts receivables and payables. While SMI worked to finish the Halliburton job, Whitney Bank continually tightened the funding available to SMI and, through demands and requirements to satisfy the ever demanding debt service (all combined indebtedness), severely limited available funds SMI needed to run its business. Whitney Bank directed accounts

receivables and overall collections for its own purposes and determined priorities, which had the effect of taking over SMI's business.

16.

Whitney Bank's control over SMI included directing SMI customers to first pay into a "lock box" for SMI money to be allocated. That arrangement soon gave way to Whitney Bank contacting SMI customers directly, without approval or input from SMI, and directing payments directly to Whitney Bank, and later to Whitney Bank's legal counsel. This conduct irreparably damaged SMI's business and reputation, and was contrary to the contractual agreement.

17.

Throughout the year 2016, while SMI worked to complete the Halliburton job, SMI requested flexibility and reconsideration from Whitney Bank. At one point, a Whitney Bank employee proposed to convert the SMI indebtedness to a regular line of credit that featured a maximum loan value that would provide necessary additional funding to SMI, while still securing Whitney Bank. That proposal was rejected.

18.

The job factors, market conditions, and onerous control exercised by Whitney Bank resulted in an over advance of the special line.

19.

SMI, with the cooperation and support of Halliburton, also brought a plan to Whitney Bank that would allow continued operations of SMI, delivery of the Halliburton project, and met all of Whitney Bank's requirements and security needs. Whitney Bank agreed to the plan at one point, only to later abort the plan with no notice or explanation to SMI. Like SMI, Halliburton was left confused and disturbed by Whitney Bank's conduct.

20.

With no control over its own accounts receivables and payables, and Whitney Bank putting itself in between SMI and its customers, SMI's ability to protect itself and maintain healthy operations was usurped. Again, the full opportunity to satisfy the original loan (SMI Note No. 1), the special line of credit (SMI Note No. 2), and the credit card was taken from SMI.

21.

The actions of Whitney Bank further damaged the business of SMI through non-compliance with customer payment requirements and service agreements. Whitney Bank's failure to comply with contractual payment requirements of certain customers led to loss of business for SMI. The failure to communicate all of its heavy-handed collection efforts to SMI resulted in duplicate collection efforts by SMI, which further damaged SMI's reputation and status in its market.

22.

Following the aborted plan brought by SMI, with cooperation of Halliburton, to see the project through while securing Whitney Bank's interests, SMI has been completely cut off from communication regarding its own business matters. Whitney Bank is depriving SMI of information regarding its own accounts receivables, collection efforts, and overall cash position. Whitney Bank has taken control over SMI and eliminated communication to such a degree that SMI cannot prepare a balance sheet, prepare for income taxes, or operate in any semblance as an ongoing business.

## II.  LEGAL BASIS FOR RECOVERY

## <u>COUNT ONE – BREACH OF FIDUCIARY DUTY</u>

23.

The allegations of paragraphs 1 through 22 are incorporated herein by reference.

24.

The dealings between SMI and Whitney Bank resulted in more than an ordinary lender and customer relationship. Whitney Bank was directly and tangibly involved in the feasibility study for the Halliburton project and collaborated on the orchestration of the special line of credit. The prior customer relationship combined with the special, confidential information obtained by Whitney Bank regarding SMI's business, projects, and overall affairs, constitutes a confidential relationship. At all times complained of herein, Whitney Bank owed to SMI the duties of a fiduciary.

25.

SMI entrusted Whitney Bank with its confidential information believing that Whitney Bank's interest were aligned with SMIs, and that the successful completion of the Halliburton project would benefit all concerned. To that end, SMI entrusted Whitney Bank with input and decision making regarding such business matters as company payroll.

26.

Unfortunately for SMI, Whitney Bank used this trust and confidence to establish and manipulate a position of superiority at the expense of SMI and Vaughn S. Lane. In one such instance, Whitney Bank coerced Vaughn S. Lane to allocate funds from a separate and unrelated business (also a customer of Whitney Bank) to cover SMI payroll. Resistance to the proposal was met with hostility by Whitney Bank. Lane was ultimately compelled to mix these unrelated

company funds because SMI needed Whitey Bank's cooperation and participation to finish out the Halliburton project.

27.

Whitney Bank took on the role of SMI's receivable collections and directed business expense payments for SMI. In so doing, Whitney Bank ultimately determined how SMI's business was run on a daily basis. Whitney Bank communicated with SMI customers and stepped into the business dealings SMI had with those customers, to the detriment of SMI.

28.

Whitney Bank only had the opportunity to commit the acts described herein due to the special, confidential relationship established with SMI. Once the fiduciary relationship was established Whitney Bank was obligated to act in good faith, with fairness, and in a manner that would not destroy SMI's business.

29.

Whitney Bank breached its fiduciary duty owed to SMI in the following, non-exclusive, particulars:

     a.     excessive and mismanaged control over SMI's business affairs;

     b.     inequitable conduct in dealing with SMI and its customers;

     c.     violations of Louisiana law to act reasonably under the circumstances;

     d.     misuse of control and superior business position in enforcing the loan agreement;

     e.     as more fully described and alleged in Counts Two through Eight hereinbelow, which are also incorporated by reference.

## COUNT TWO – BREACH OF DUTY TO DEAL IN GOOD FAITH

30.

The allegations of paragraphs 1 through 29 are incorporated herein by reference.

31.

As alleged by Whitney Bank in its Complaint, the special credit line is evidenced by SMI Note No. 2 and secured via a "Commercial Security Agreement," with notice to third parties being provided by a financing statement pursuant to the Uniform Commercial Code. (Doc. 1, Exhibits "B" and "G" thereto) The UCC imposes upon all parties the duty of good faith dealing, which Whitney Bank has breached. Whitney Bank breached its duty to deal and conduct its dealings in good faith.

32.

On June 28, 2016, Whitney Bank withdrew committed payroll funding two hours before a deadline for the purpose of coercing $87,000 from an unrelated company (a customer of Whitney Bank.)  This Whitney Bank act of coercion and bad faith dealing took SMI and Whitney Bank operations outside of the loan contract parameters, and evidences Whitney Bank's abuse of its superior position.

33.

On July 21, 2016, Whitney Bank aborted without explanation the Halliburton/SMI/Whitney Bank negotiations at the point of final deal acceptance.  Late in the day after several SMI/Bank phone conversations, Whitney Bank Commercial Loans phoned SMI to say there would be no further Whitney Bank communication with SMI or Halliburton on any matter.  SMI was told Bank communication would resume at an unknown date with an unknown Bank party.

34.

Whitney Bank conducted clandestine negotiations with an SMI customer (also a Whitney Bank customer) for payment terms to release finished fabrication.  This Whitney Bank negotiation ignored SMI payment terms already in place with the customer.  As a result, SMI collections were severely compromised, payment delayed, and the customer cancelled his contract with substantial work remaining –directly causing lost revenue to SMI.

35.

Whitney Bank required weekly SMI cash-need reporting and regularly discussed in depth the ongoing SMI business status.  As a routine, the Bank, after funding assurance, then funded at its discretion and, most often, funded short of need or changed expected funding amounts.  These bad faith dealings caused broken SMI commitments to critical job suppliers and weakened important supplier relationships.

36.

After repeated requests, Whitney Bank refuses to provide business details of its SMI collection efforts.  Whitney Bank collection efforts were a great contributor to SMI customer contract cancellations and SMI loss of customer work qualifications.  SMI is unable to create an accurate financial statement for loan agreement compliance because of missing Whitney Bank data that is SMI operating information.  This lack of financial information voids any SMI efforts with investors, joint venture opportunities, alternative finance, commercial insurance accessibility, and mandatory tax reporting is not possible.

## COUNT THREE – NEGLIGENT MISPRESENTATION

37.

The allegations of paragraphs 1 through 36 are incorporated herein by reference.

38.

Through its special and confidential relationship with SMI, Whitney Bank owed a legal duty to provide SMI with accurate information regarding its actions related to SMI's business. This legal duty was owed pursuant to principles of general negligence, including but not limited to, La. Civ. C. art. 2315 and 2316. As described herein, Whitney Bank breached this duty through various acts and omissions, and caused damage to SMI and Lane, who relied on the special relationship with Whitney Bank to their detriment.

39.

In keeping with the Whitney Bank commitment for job support, particular communications between SMI and Whitney Bank made arrangements to pay a critical vendor on the Halliburton job.  SMI sent a check (with Bank knowledge) to the vendor so that a shipment could be released. Whitney Bank then, without warning, denied payment of the check causing the vendor to stop delivery on two future scheduled shipments for the Halliburton job.  This critical job interruption introduced compromise on the job delivery date, unnecessarily generated customer contract concerns, and unnecessarily consumed SMI resources to reschedule work and negotiate vendor payment directly by Halliburton.

40.

Whitney Bank made repeated support statements in phone calls and meetings with SMI that the Halliburton job must finish and that payroll must be made.  After having confirmed payroll funding for June 28, 2016, the Bank withdrew the commitment two hours before a funding

deadline.  The Bank demanded payroll funding by VS Lane & Company, a company unrelated to the SMI loan.  Under duress, Lane acquiesced to the $87,000 funding demand and that payroll of SMI was made.  The Bank then resumed payroll commitment in following weeks.  This action caused financial loss for VS Lane & Company and Vaughn Lane personally.

41.

Whitney Bank made claim and represented to have knowledge of invoice related Master Service Agreements, job contracts, purchase orders, and invoicing requirements common to the energy/petrochemical industries, and in particular those of the major customers of SMI, and specifically those of Halliburton.  Whitney Bank repeatedly confirmed commitment to finish the Halliburton contract.    Whitney Bank represented the special line approval to support the Halliburton contract was based upon the operating strength, market presence and the ability to pay of Halliburton.   Contrary to these representations, Whitney Bank withdrew support for job finish, aborted negotiated (Halliburton, Whitney Bank, SMI) plans for job payment changes in the Bank's favor, and severed communication with both SMI and Halliburton without explanation.  This unexpected and severe Bank action resulted in Halliburton canceling the job with associated financial stress falling upon SMI.

## COUNT FOUR – ABUSE OF RIGHTS

42.

The allegations of paragraphs 1 through 41 are incorporated herein by reference.

43.

Pursuant to La. Civ. C. art. 2474, Whitney Bank had a duty to refrain from exercising its rights granted by the loan and security agreements with reasonable care, in good faith, non-

negligently, and a way that would not unduly harm SMI's business. Whitney Bank breached its duty to SMI through abuse of its rights.

44.

The Whitney Bank right to fund was abused as the Bank made funding commitment and most often changed the commitment with actual performance of funding amounts and/or funding timing. This created an unstable critical resource with resulting compromises to SMI management decisions, as well as increasing SMI operating costs. Whitney Bank's funding performance was not in keeping with fiduciary responsibility or obligation to deal in good faith.

45.

The Whitney Bank right to notify customers was abused as the Bank proceeded without regard to SMI customer qualifications and customer contractual options with invoices subject to Master Service Agreements, contracts, and purchase orders. Further, notification was with incorrect procedure (per the Commercial Security Agreement) and Whitney Bank actions ignored the collateral position of SMI ownership. SMI was not allowed to participate in a business correct notification. Whitney Bank actions created confusion and alarm among the SMI customer base as well as disqualifying SMI for future business with customers.

46.

The Whitney Bank right to collect was abused as the Bank, contrary to contract, demanded Bank payment to be received at a non-Bank attorney business. This attorney based collection procedure, complete with implied threats of legal action, was a primary source of SMI contract and work opportunity cancellations throughout its customer base.

## COUNT FIVE – TORTIOUS INTERFERENCE WITH BUSINESS

47.

The allegations of paragraph 1 through 46 are incorporated herein by reference.

48.

Whitney Bank owed SMI a legal duty to refrain from unduly interfering with or damaging business relationships and reputation through its acts and omissions. At all times, the Bank had full knowledge that a failure to act reasonably and professionally when contacting and dealing with SMI's customers and business relationships, could irreparably damage SMI. Whitney Bank breached this duty and caused damage to SMI and Lane, pursuant to La. Civ. C. art. 2315 and interpretive jurisprudence.

49.

Whitney Bank negligently engaged in accounts receivables collection efforts independent of SMI and without communication or coordination with SMI.  SMI gave multiple warnings to Whitney Bank Commercial Loans regarding collections without consideration of Master Service Agreements, Purchase Order qualifications, and customer options including contract cancellation. SMI customers were subjected to a dual and simultaneous collection effort on amounts due SMI. Agreements and coordination in place by SMI with customers were destroyed with the Bank's attorney pursuit of collections.

50.

Further, Whitney Bank collections were done with improper customer notification. Whitney Bank would not respond to SMI inquiry regarding customers contacted and amounts

collected.  Because Whitney Bank used an attorney for collection (though no loan default existed), SMI lost control of collections as Whitney Bank negligently controlled this aspect of SMI business.

51.

Whitney Bank funded weekly based upon cash needs defined by SMI and controlled SMI funds disbursements.  Whitney Bank took final decision for the loan advance amount, most often short of total need, restricting SMI actions/decisions to primarily addressing and making Bank decisions work.  Disbursement priorities were to the Bank's advantage rather than job support requirements resulting in compromise of supplier support.  Whitney Bank used a superior position to control SMI business disbursements and loan pay down.  Whitney Bank was negligently controlling the business operating cash of SMI to the detriment of SMI's business.

52.

At all times pertinent, Whitney Bank maintained the ability to go over line loan limits using verbal commitments, as provided by contract.  The Bank agreed to multiple verbal over line events, but subsequently pressured SMI to rapidly pay down the over line amounts using varying Bank discretionary amounts and Bank application of funds upon debt.  SMI management plans were compromised and weakened because of instability in loan funding and pay down.  Loan funding and pay down were at the Bank's discretion, varying from 0% to 100% of collections.  Bank procedures evolved so that collections were applied on loans at the Bank's discretion and loan contracts became mixed with regard to collections.  SMI management was controlled by the Bank because SMI management was obligated by contract (Notes and Commercial Security Agreement) to accept and comply with Bank procedures and loan requirements.  The Bank was controlling the funds of SMI.  The Bank was controlling the payment of SMI obligations to suppliers.  Whitney

Bank, with a binding loan agreement, failed in its obligation of good faith performance on repeated commitments to fund the Halliburton job to completion.

53.

Whitney Bank engaged in clandestine negotiations with an SMI customer for work payment and delivery of product.  This SMI customer was also a customer of Whitney Bank.  The payments acceptable to the Bank were favorable to the SMI customer and different than the SMI payment requirements in place with the customer when Bank negotiations began.  Whitney Bank's negligence and interference resulted in cancellation of the unfinished contract by the SMI customer.  Significant revenue was lost by SMI.

54.

Whitney Bank negligently caused an excessive collection delay and a very damaging cash flow interruption for SMI.  Through Whitney Bank's negligent actions, physical movement of jobs through the shop was disrupted with additional operating costs now falling upon SMI.  Whitney Bank failed to report customer communications to SMI as required by the Commercial Security Agreement contract.

55.

These and other customer negotiations occurred at a time when SMI was denied communication with Bank officers and Bank affairs were executed by the Bank's attorney without SMI involvement, or that of its own counsel.  Whitney Bank negligently conducted SMI/customer business totally without SMI involvement.

56.

Whitney Bank failed to respond to repeated SMI requests for collection information from the Bank's collection efforts.  At present, SMI is unable to produce a financial statement to comply with loan and security agreement requirements.  Without a correct financial statement, SMI is unable to pursue alternative finance, investor opportunity, joint ventures, supplier relationships, insurance renewals, new customer vendor qualifications, bonding, or tax reporting.

## COUNT SIX – TORTIOUS INTERFERENCE WITH CONTRACT

57.

The allegations of paragraphs 1 through 56, as well as all allegations of breach of contract hereinbelow, are incorporated herein by reference.

58.

The allegations of this Counterclaim were undertaken by certain officers of Whitney Bank, who will be identified through discovery and for whom Whitney Bank is responsible pursuant to the doctrine of *respondeat superior*, rise to the level of intentional, unjustified and malicious interference with SMI's contract with Whitney Bank, as well as third parties.

59.

At all times pertinent, these Whitney Bank officers: knew of and participated in the contractual relationship with SMI, including the special fiduciary relationship established; intentionally caused or directed Whitney Bank to breach the contract with Whitney Bank and/or made performance by SMI or Lane impossible or more burdensome; did so without justification; and, directly caused damages to SMI and Lane through the breach of contract and rendering performance impossible.

60.

Officers of Whitney Bank intentionally induced or caused SMI to breach the terms of the relevant agreements by engaging in clandestine negotiations with an SMI customer for work payment and delivery of product.  This SMI customer was also a customer of Whitney Bank.  The payments acceptable to the Bank were favorable to the SMI customer and different than the SMI payment requirements in place with the customer when Bank negotiations began.   Bank interference resulted in cancellation of the unfinished contract by the SMI customer.  Significant revenue was lost by SMI.

61.

Officers of Whitney Bank intentionally induced or caused SMI to breach the terms of the relevant agreements by causing an excessive collection delay and a very damaging cash flow interruption for SMI.  Physical movement of jobs through the shop was disrupted with additional related operating costs now falling upon SMI.  Whitney Bank failed to report customer communications to SMI as required by the Commercial Security Agreement contract.  Bank affairs were executed by the Bank's attorney without SMI/attorney involvement.  Whitney Bank was conducting SMI/customer business totally without SMI involvement.

62.

Officers of Whitney Bank intentionally induced or caused SMI to breach the terms of the relevant agreements by failing to respond to repeated SMI requests for collection information from Whitney Bank collection efforts.  SMI is unable to produce a financial statement to comply with Loan Agreement requirements.  Without a correct financial statement, SMI is unable to pursue alternative finance, investor opportunity, joint ventures, supplier relationships, insurance renewals,

new customer/vendor qualifications or tax reporting, all of which are business necessities for SMI to fulfill its contractual agreements with Whitney Bank.

63.

Officers of Whitney Bank intentionally induced or caused SMI to breach the terms of the relevant agreements by taking SMI completely out of its market through the unnecessary use of an attorney who sent aggressive, suit threatening communication to the entire SMI customer base for accounts receivable collections.  SMI was made unable to qualify for Master Service Agreements and vendor approval qualifications among energy/petrochemical and other customers who are users of specialty heavy steel fabrication.  This Bank action intentionally ignored SMI ownership of the receivables, denied SMI participation in the collection process, and caused customer cancellation of contracts underway as well as contracts set to start.

64.

Because the officers of Whitney Bank short funded job needs, controlled the operations, and subsequently the operating shut-down of SMI, Whitney Bank intentionally destroyed the value of SMI vendor assets (sales on account to SMI.)   Through these officers Whitney Bank intentionally took value from SMI vendors for its own financial benefit.  As a result, SMI has lost contract qualification among its vendor support base and vendors have suffered significant financial damage, the product of which is to render performance on the loan agreements impossible for SMI and Lane.

## COUNT SEVEN – BREACH OF CONTRACT

65.

The allegations of paragraphs 1 through 64 are incorporated herein by reference.

66.

The Commercial Security Agreement entered into between Whitney Bank and SMI, evidences binding obligations and the law as between the parties. Whitney Bank breached its contractual obligations to SMI. (Doc. 1, Exhibit "G" thereto)

67.

The Commercial Security Agreement recognizes accounts receivable collateral is owned by SMI Companies Global, Inc. (See "Perfection of Security Interest" and "Notice to Obligors"). Further, the contract names the Lender as the specific party to execute customer notifications using Bank directed SMI communication, and the Lender is the specific party to receive payment funds. When the Lender exercises its collection rights, the agreement requires the Lender itself to directly collect and receive all accounts receivable proceeds. (See "Collect Revenues" and "Apply Accounts"). Whitney Bank breached its contractual obligations in the following ways:

a.      SMI received no request for any obligor (other than Halliburton) to be notified of a Whitney Bank election regarding accounts receivable, despite the fact that SMI notification is required because SMI owns the receivables and must direct customers to a new payment remittance address if other than the address of SMI;

b.      Whitney Bank used the Bank's attorney rather than a Bank directed SMI communication to notify customers identified on the SMI July 26, 2016 A/R ageing that defined the loan collateral base;

c.      The Bank attorney notification of August 10, 2016 required payments submitted to the attorney office for payment receipt rather than payments sent and made directly to a Whitney Bank address;

d.      The Bank attorney notification threatened a customer suit even though no past due condition existed;

e.      The Bank attorney notification ignored customer rights and options in customer contracts that allowed job cancellation;

f.      The Bank attorney notification was grounds for customer disqualification of SMI to do present work underway as well as future business;

g.      The Bank directed these actions despite the fact that the contract distinguishes Bank collections and attorney collection, the attorney to be used in suit; otherwise the Bank does collection;

h.      Aggressive and improper Bank attorney action over the total SMI customer base was conducted before the Whitney Bank declaration of default on August 18, 2016.

68.

Communication by Whitney Bank attorney to SMI customers for purposes of collection was undertaken while ignoring the contract provisions for specific accounts receivable collateral definition. (See "Perfection of Security Interest"), as well as the obligation of good faith, and acceptable and standard business practices:

a.      To comply with its good faith agreement and fiduciary duty, Whitney Bank actions must consider the contract components between SMI and customer that define the account receivable, because the job contract has qualifications (a norm in the industry) for account validity, payment, and value as well as job continuation;

b.      Despite the good faith and fiduciary obligations, Whitney Bank never asked SMI for details of customer (exception Halliburton) contracts and qualifications and acted with a complete disregard for same;

c.     Whitney Bank never asked SMI for a customer collection status or expectations/arrangements, but instead proceeded with an improper attorney based collection effort totally independent of and with no communication to SMI.

69.

Whitney Bank engaged in activity to collect monies from SMI customers that was not owed.  This activity is contrary to the contract as the Bank demanded payment for work not done and monies not due SMI. (See "Collateral Description"):

a.     A Whitney Bank attorney demand letter was sent Cargill, with threat of collection suit, for payment of seven invoices where monies were already collected by Whitney Bank for the seven invoices;

b.     A Whitney Bank attorney demand letter was sent Tanks-A-Lot for work not done with threat of collection suit;

c.     A Whitney Bank attorney demand letter was sent Halliburton for work not done with threat of collection suit.

70.

Bank management procedures for SMI included a weekly approval and specific funding of payroll.  Whitney Bank gave repeated assurances of payroll funding and repeatedly confirmed with SMI not to worry about payroll, because payroll was a necessity in support for job completion – completion that both SMI and Whitney Bank wanted. Whitney Bank repeatedly breached this contractual agreement.

71.

On June 28, 2016, Whitney Bank first confirmed payroll funding then, two hours before required funding deadline for the payroll direct deposit program, cancelled the funding; The Bank

required $87,000 on deposit of VS Lane & Company (unrelated to the SMI loan but a Whitney Bank customer) be moved to SMI Global to fund the payroll.  This was an act of coercion where Lane had no choice but to comply with the demand of the Bank. Thereafter, Whitney Bank continued as before approving weekly payroll because Lane "now had skin in the game." No such additional "skin in the game" was required by contract, and was an affront considering Whitney Bank's activities were destroying SMI.

72.

The failure of payroll commitment was a direct breach of the loan agreement, specifically "Cessation of Advances" - as none of the qualifiers for this cessation of advances provision existed.

73.

Whitney Bank engaged in clandestine negotiations with an SMI customer for work payment and delivery of product.  This SMI customer was also a customer of Whitney Bank.  The payments acceptable to the Bank were favorable to the SMI customer and different than the SMI payment requirements in place with the customer when Bank negotiations began.  Whitney Bank was conducting SMI/customer business totally without SMI involvement.  Whitney Bank failed to report their communications with Tanks-A-Lot negotiations to SMI as required by the agreement. (See "Notification of Lender").

74.

Whitney Bank's other breaches of its contractual and fiduciary duty for communication and notification continue, and include but are not limited to the following:

a.      On July 21, 2016, Whitney Bank severed all communications with SMI.

b.      SMI was told the commercial loan file was being sent to another office, but when asked, Whitney Bank would not say who at Whitney Bank would get the file, no office would be named, and no person would be named.

c.      Whitney Bank would not inform SMI of the time the Bank would again contact SMI.

### III. DAMAGES

75.

As a company, prior to the event described herein, SMI was recently valued at approximately $7 million dollars. Through the acts and omissions described herein, SMI is now unable to operate. The acts and omissions of Whitney Bank, and its officers for whom it is responsible, have caused significant damages to SMI and Lane, all of which were foreseeable on the part of Whitney Bank and occurred despite reasonable efforts on the part of SMI and Lane to avoid them, in the form of:

a.      the full amount of liability for the Whitney Bank indebtedness, including the original loan (SMI Note No. 1), the special line of credit (SMI Note No. 2), the credit card, and all applicable interest, fees, and penalties, that Whitney Bank seeks from SMI and Lane in its "Complaint for Collection of Promissory Notes and Related Guaranty and for Recognition of Security Interests";

b.      lost profits;

c.      overall loss of business value;

d.      lost business opportunity;

e.      damage to business reputation and good will;

f.      damage to perceived creditworthiness;

g.      other elements of damages, which will be proven at trial.

## IV.  JURY DEMAND

Pursuant to Fed. R. Civ. Pro. Rule 38, SMI and Lane hereby demand a trial by jury on all issues.

## V.  PRAYER

**WHEREFORE** Counterclaim Plaintiffs, SMI Companies Global, Inc., and Vaughn S. Lane, pray their Counterclaim be deemed good and sufficient, and that after service and due proceedings are had, that there be judgment in their favor, against Whitney Bank, for all damages, costs of this matter, and, where applicable, for attorney fees.


|                                          | s/ Ryan N. Ours                     |
| Brent P. Frederick (#25053)              | Ryan N. Ours (#27735)               |
|  brent@frederickbeckers.com              |  ryan @frederickbeckers.com         |
| Michael T. Beckers (#30197)              | 112 Founders Drive                  |
|  michael@frederickbeckers.com            | Baton Rouge, LA  70810              |
| Danielle N. Goren (#34563)               | Telephone: 225.372.6473             |
|  danielle@frederickbeckers.com           | Facsimile: 225.372.6015             |
| 112 Founders Drive, Suite 101            |                                     |
| Baton Rouge, LA  70810                   |                                     |
| Telephone: 225-372-6000                  |                                     |
| Facsimile: (225) 372-6015                |                                     |


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing pleading has been served upon counsel for Plaintiff and Counterclaim Defendant by electronic case filing via the Court's CM/ECF electronic filing system, pursuant to Local Rules and SO 1.94.

This the 28th day of December, 2016.

s/ Ryan N. Ours

RYAN N. OURS